No. 24,866.

The Croft State Bank, *Appellant*, v. V. F. Girardy, *Appellee*.

SYLLABUS BY THE COURT.

Chattel Mortgage — *Joint Adventure in Operation of Farm — Authority to Mortgage Live Stock for Money to be Used in Operation of Farm.* The evidence as against a demurrer is held to show that the owner of a farm and its occupant were engaged in such a joint adventure in its operation as to authorize the latter to mortgage live stock thereon for money to be used in carrying on the business, and that the mortgages in question were given for that purpose and were valid.

Appeal from Kiowa district court; Littleton M. Day, judge. Opinion filed February 7, 1925. Reversed.

*William Barrett, George Barrett,* both of Pratt, and *John D. Beck,* of Greensburg, for the appellant.

*J. W. Davis,* of Greensburg, for the appellee.

The opinion of the court was delivered by

Mason, J.: On August 1, 1914, V. F. Girardy rented three quarter sections of land to C. A. DeMoss for one year for a crop rent, the written lease containing a number of special provisions, one being that the landlord might place live stock on the land, the increase to be divided equally. DeMoss occupied the land for several years, and in the spring of 1920 executed to the Croft State Bank three notes for the aggregate amount of $1,600, secured by mortgages on cattle on the place. The bank brought this action against Girardy for the possession of the cattle under the mortgages, upon the theory that, by virtue of changes orally made in the arrangement between Girardy and DeMoss, they had become partners and that the money was borrowed in the course of the partnership business for its use. The defendant contested both propositions. The trial court sustained a demurrer to the plaintiff's evidence, and the appeal is taken from that ruling.

By the terms of the lease Girardy was to have two-thirds of the wheat and of any other crop that might be planted by mutual agreement. He was to furnish the seed wheat for the first year, but if the lease were extended for another year the seed wheat was to be taken from the crop of 1915. He was to furnish a man to help work the land from June 1 to August 31, 1915, he paying the wages, DeMoss providing board and lodging; and if the lease were extended

for another year the man was to be furnished to November 1, 1915. DeMoss was to care for the stock and keep up repairs on implements. If Girardy rented other land for spring crops the crop was to be divided equally after Girardy was reimbursed for rent paid, Girardy furnishing horses and implements and DeMoss doing the work. Girardy was at his option to place suitable stock on the land, to be maintained from feed raised there, DeMoss to care for it, the increase to be owned in common, the profits to be divided equally. DeMoss was to bear all expenses of handling crops or stock except as above stated. Receipts from stock taken for pasturage were to be divided equally.

The contention of the plaintiff is that by oral agreements afterwards entered into by Girardy and DeMoss the arrangement between them was changed into one of partnership, DeMoss to manage the business and to have authority to borrow money upon the credit of the property. DeMoss gave testimony tending to show these facts:

The two rented an additional quarter and Girardy bought another one. In November, 1915, there was about 160 acres of feed, and they bought 60 yearling steers, Girardy saying: "I will buy steers and we will share the profits and losses. If they don't make anything, we don't lose much, nothing but our feed." Feed raised on the place in 1915 was fed to them. They were sold and the profits (after they were paid for) were divided, each getting half of $600 or $700. The next year (1916) over 200 acres of feed was raised and 36 head of heifers and cows were bought in December, Girardy saying: "After these cattle are paid for we will go half and half on the cattle." It was said if there was not enough feed grown it was to be bought, each paying half the cost. Girardy was to furnish the money and DeMoss was to pay back half of it. They were to share the profits and losses alike. These cattle were fed from the feed raised on the place and some were sold. In two years something over $2,000 worth were sold. Girardy told DeMoss to sell the cattle and send the money to the Security bank at Wichita "on the note," and he did so. Girardy was in Texas most of the time, coming up once or twice a year. DeMoss rented pasture for the cattle, and Girardy later asked how much the bill was and made no objection. In the fall of 1918 Girardy told DeMoss he would give him half the wheat from then on. "He said we would be partners in all, crop, feed and cattle." On January 26, 1919, Girardy and DeMoss

signed a memorandum stating that a list of fifteen cows, eleven yearlings and fourteen calves was according to settlement made that day, adding, "Same are to be divided half and half," followed by the words, "To be included as above, two horse colts and one mule colt and all the hogs on the place to date." In 1919, twenty-eight head more were bought and fed. DeMoss bought feed from others, and bought all his rent feed—his third—two different years. He also leased other pastures, to pay for a part of which money was sent him by Girardy, who was paid back by note. Girardy sent him part of the money to take care of the cattle and he borrowed a part from the Croft State Bank and the Wellsford bank. Girardy told him to get the money to run the place from the bank, not limiting him to any particular bank. DeMoss told the cashier of the Croft bank that the cattle belonged to him and Girardy in partnership, and borrowed some money, telling him it was to run the partnership business, to buy feed, giving the mortgages as security. To a question by the cashier as to why he did not sign the partnership name, DeMoss answered that there was no partnership name—that he always signed his own name for money for the partnership. Girardy had told him to sign his own name and get money to do business for the partnership. One of the chattel mortgages sued upon was identified as that given when this talk was had with the cashier. The changes made in the original arrangement as embodied in the lease included these: DeMoss was to own half of the original stock that had belonged to Girardy as soon as Girardy had received what he had paid for them; Girardy was to furnish half the feed for the stock; the feed used was not all to be raised on the place; Girardy was to stand half the cost of additional feed. The changes were made in 1917 and 1918. After borrowing the money of the Croft State Bank, DeMoss told Girardy of it, about June, 1920, although he already knew about it, and he said it was all right—everything was all right. On June 9, 1920, an indorsement was placed on the original lease, signed by the parties, reading, "The above lease is this day canceled, but no settlement made and no inventory taken." Checks drawn on the bank account by DeMoss were sometimes for his own personal matters and sometimes to pay for feed and other things for the benefit of himself and Girardy. DeMoss had a book in which he made entries showing his own private transactions and also those of the partnership; it was kept in a dresser drawer of a room in which Girardy slept for three weeks in May and June, 1920, and disappeared at that time.

It was not essential to the plaintiff's recovery that the arrangement between Girardy and DeMoss should have amounted to a general partnership, or to a partnership at all in the strict sense, as the term is accurately used. The testimony of DeMoss lacks definiteness, but giving it the favorable construction, aided by reasonable inferences, to which it is entitled upon a demurrer to the evidence, it is sufficient to show *prima facie* that he and Girardy were engaged in such a joint adventure as to enable him to make a valid mortgage upon the cattle to raise money for the benefit of the business. It is said, "the leasing of a farm for a term of years under an agreement that the owner shall receive in lieu of rent a stipulated portion of the net profits derived from the sale of the crops produced thereon is generally held to create a joint adventure," and that if an agreement that a lessor is to receive a portion of the net profits as rent "goes further and gives to the lessor any control over the business conducted in the leased premises, it is usually construed to constitute the parties joint adventurers in respect to third persons." (33 C. J. 843.) Also: "The member of a joint adventure who holds the title to real, or the possession of personal, property belonging to himself and his associates is presumed to have authority to mortgage or pledge it to raise money for the purposes of the enterprise or to secure debts incurred in carrying it on, and such mortgage or instrument of pledge, although signed by him individually, binds his associates as respects their interest in the property mortgaged or pledged." (33 C. J. 873.)

By the same liberality of construction, the evidence as against a demurrer must be held to have a tendency to show that the mortgages in controversy were given to raise money to carry on the business and that the proceeds were in part at least used for that purpose; that Girardy consented to or at least acquiesced in such arrangement, and that the bank lent its money in reliance upon the existence of a joint adventure.

The judgment is reversed and the cause remanded for further proceedings.